On Motion to Dismiss.
After this case was submitted on its merits, and after the opinion on the merits had been prepared, the Baton Rouge Sash 
Door Works and the Landry Bros. Lumber Company, who are the appellees herein, filed a joint motion to dismiss the appeal, and also a motion to remand the case to have evidence adduced on the motion to dismiss should the court deem that course necessary.
The motion grows out of the following facts, to wit: After McKendrick had erected the house, which he partly did with material *Page 390 
sold him by the Baton Rouge Sash Door Works and by the Landry Bros. Lumber Company, he sold the house and the lot upon which the house was erected to plaintiff for cash. Plaintiff, before purchasing, had the mortgage records of the parish where the property is situated examined, and, from the examination, ascertained that there were no building liens of record against the property. However, being informed that the house had been very recently erected, and realizing that it was possible that building liens might be recorded against the property after the purchase of it, and that these liens might be held valid, plaintiff exacted of McKendrick a bond with good and solvent surety to protect it from any such liens. The Indemnity Insurance Company of North America signed the bond as surety. The Baton Rouge Sash Door Works and the Landry Bros. Lumber Company now allege that they have ascertained that the surety on the indemnity bond has paid to plaintiff the full amount of their claims with interest and all expenses. Based upon this allegation these companies move to dismiss the appeal herein, averring that because of this payment plaintiff no longer has any interest in prosecuting this appeal.
We may assume, which we do, that plaintiff has been paid by the surety on the bond the full amount of these claims, still this does not present a valid reason to dismiss the appeal. The furnishing of the bond was merely a personal matter between plaintiff on the one side and McKendrick and the Indemnity Insurance Company of North America on the other side. The only purpose of the bond was to indemnify plaintiff for any loss it might sustain in purchasing the property because of possible building liens against it. Neither of the appellees mentioned has any interest in the bond. The only possible effect of the payment was to place in plaintiff's hands an amount sufficient to pay these claims, should the property involved herein *Page 391 
be held liable for them. Such being the case, the validity of the liens, notwithstanding the payment, still remains an issue in the case, and plaintiff, instead of having the bond to protect it from the liens, has the money paid it by the surety on the bond with which to do so. Because plaintiff is protected against these liens is no reason to dismiss its appeal.
For these reasons the motion to dismiss is denied, as also is the alternative prayer to remand.
 On the Merits.
Charles McKendrick erected a residence on a lot belonging to him and located in a suburb of the city of Baton Rouge, known as Fairfields. He erected the building himself; that is to say, he did not enter into a contract for its erection. The building seems to have been completed during the first part of September, 1925. On September 17, 1925, he sold the lot to the Capital Building Loan Association, the plaintiff herein, for a recited consideration of $4,500 cash. The deed was recorded in the conveyance records of East Baton Rouge five days later. On the same day on which plaintiff bought the property, it sold it to Hilton V. Carter, the defendant herein, for a consideration of $2,800, for which Carter gave plaintiff his promissory note payable on demand, bearing 7.8 per cent. per annum interest, containing the usual clause of 10 per cent. attorney's fees, and secured by vendor's privilege and special mortgage on the property sold. This sale, with vendor's privilege retained and special mortgage granted, was recorded in the mortgage records of the parish of East Baton Rouge on September 22, 1925.
The Baton Rouge Sash Door Works and the Landry Bros. Lumber Company, the interveners herein, sold to McKendrick material to be used, and which was used, in the construction of the residence on the lot, which was later sold, together with the residence thereon, to plaintiff. The material furnished *Page 392 
by the Baton Rouge Sash Door Works to McKendrick was sold to him for $408.95 and was delivered at various times between July 5 and August 3, 1925, and that furnished by the Landry Bros. Lumber Company was sold to McKendrick and delivered at various times between June 20 and September 8, 1925. The Baton Rouge Sash Door Works recorded an affidavit in the mortgage records of the parish of East Baton Rouge on December 30, 1925, showing the amount of the lien and privilege claimed by it, which is for the full purchase price of the material that it sold to McKendrick, and the Landry Bros. Lumber Company recorded a similar affidavit, on February 1, 1926, in the same records, showing that the privilege claimed by it, as furnisher of material, was for the full amount of the material that it sold and delivered to McKendrick.
On May 1, 1926, plaintiff instituted the present proceeding, which is one to foreclose by executory process its vendor's privilege and special mortgage on said lot and building. A writ of seizure and sale issued for $2,791.46, with interest and attorney's fees, as fixed in the note described above, the aggregate of which is the balance of the indebtedness due on the privilege and mortgage. The property was sold by the sheriff, under the writ, for $3,250. The Baton Rouge Sash Door Works and the Landry Bros. Lumber Company intervened in the suit, asserting the privileges claimed by them, as furnishers of material, on said lot and building, and praying that they be paid out of the proceeds thereof by preference over plaintiff. Plaintiff filed answers to these interventions, in which it averred substantially that, prior to purchasing the property, it examined the mortgage records and found no liens recorded against the property, and, moreover, that, if interveners, at the time plaintiff purchased, had a right to the liens claimed by them, they have lost the liens by failure to record them within the time prescribed by law. *Page 393 
Section 19 of article 19 of the Constitution of 1921 provides, in part, as follows:
 "No mortgage or privilege on immovable property, or debt for which preference may be granted by law, shall affect third persons unless recorded or registered in the parish where the property is situated, in the manner and within the time prescribed by law. * * *"
Under this provision a lien or privilege may affect third persons during the period in which it is not of record, if, eventually, it is recorded in the manner and within the time prescribed by law. Gleissner v. Hughes, 153 La. 133, 95 So. 529.
The next question is whether interveners have lost their right to the privileges which they claim by failing to record them in time, or, in other words, whether they failed to acquire the privileges by neglecting to record them within the time prescribed by law. The building was erected, as we have seen, in 1925, by the owner himself, and not by a contractor for the owner. At the time of its erection Act No. 139 of 1922, which has since been repealed by Act 298 of 1926, was in force. The Act of 1922 is on the subject-matter of the construction of buildings and other works by contract and without contract. Section 11 of the act relates to the doing of the work by the owner personally, that is, not by contract, and reads as follows:
 "Whenever the owner or his authorized agent or representative undertakes the repair, reconstruction, erection or construction of a building or any other work for his own account or for which no contract has been entered into, then any person furnishing services or material or performing any labor on said building or other structure, may record in the mortgage office in the parish in which said work is being constructed, a certified copy of the building permit, or affidavit of claim or any other writing evidencing same, which recordation shall create a lien and privilege upon the building or other structure and on the land upon which it is situated as created by this act, in favor of the said contractor, master mechanic or contracting engineer, and subcontractors, workmen, journeymen, cartmen, truckmen, mechanics and furnishers of material, as their interest may arise, *Page 394 
for the period of one year from the completion or occupancy of the building or other work which term shall not run pending judicial proceedings."
Interveners contend that this section allowed them a year in which to record their privileges. In our opinion it does not. The year mentioned in the section does not refer to the time allowed for recordation, but to the duration of the privileges, created by the recordation of the affidavits or other writings, evidencing the claims. The language of the section is clearly to the effect that the recordation shall create a privilege, which shall continue in force for one year from the completion or occupancy of the building, the one year not to run pending judicial proceedings. Moreover, it is highly improbable that the Legislature would allow so long a time to perform so simple an act as to record a claim evidencing a privilege, when the allowance of such time might be expected to result in entrapping third persons.
The section is silent as to the time in which the recordation must be made. Hence, if the time is fixed, it must be found in some other section of the act, or in some other act. We think it is to be found in the act itself. Section 9 of the act reads as follows:
 "The privilege (meaning the privileges) herein granted (that is, in the act), except when special rank is given thereto, shall be of equal rank if recorded as provided in section 2 hereof, and shall be paid jointly out of the balance of funds in the hands of the owner or by the surety on the bond, if such balance is sufficient to pay them in full."
Here the act provides that the privileges granted by it shall be of equal rank, except where special rank is given thereto, if recorded as provided in section 2 thereof. The privileges granted by section 11 of the act are among the privileges granted by the act, and hence are among those referred to in section 9. Therefore here is a statement to the effect that the privileges conferred by the act, which includes those in section 11, are expected to *Page 395 
be recorded as provided in section 2. It is true that the latter half of section 9 refers to the payment of the privileges, granted by the act, out of the balance of funds in the hands of the owner or by the surety on the bond, as if the only privileges contemplated by the section are those created in section 1, when the building or other work is constructed by contract. However, it was not intended by that part to deprive the claimants, coming under section 11, of the benefits of equal rank, for no special rank has been given them. The purpose of that part of the section was merely to provide for the payment of privileges arising from the erection of a building by contract, and was not intended to limit the privileges referred to, in the first half, to those so arising. The time fixed in section 2 for the recordation of the claims is 30 days. It is true that it is there provided that this period shall not run until the registry of the owner's acceptance of the work, or the architect's certificate of completion, or the contractor's default, but these provisions as to the time when the 30-day period begins to run apply only when the building is constructed by contract. When the building is constructed by the owner personally, and not by contract, the delay runs from its completion; such being the intention of the act.
Since the Baton Rouge Sash Door Works did not record the affidavit of its claim until the expiration of more than three months from the completion of the building, and as the Landry Bros. Lumber Company did not record the evidence of the privilege claimed by it until more than four months after that date, it follows that they have lost all right to the privileges which they claim, for it suffices to say that, under section 11 of the act, recordation is essential to the creation of the privileges there granted. We therefore conclude that interveners are not entitled to the privilege claimed. In fact, interveners are dependent on maintaining their position that they had a year in which to record *Page 396 
their claims, for that is the only period which would support their contention, for which there is any color of support, and, in our view, they have not succeeded in maintaining that position.
The trial judge rendered judgment for interveners. The judgment is one in rem against the property and ordering interveners to be paid by preference over plaintiff out of the proceeds of the property. The judgment will have to be amended in favor of plaintiff, who is the only appellant.
For the reasons assigned, the judgment appealed from is amended by canceling the recordation of interveners' claims against said property, and by recognizing the right of plaintiff to be paid by preference over interveners out of the proceeds of said sale the amount of its privilege and mortgage, to wit, the said sum of $2,791.46, with 7.8 per cent. interest thereon from October 1, 1925, and 10 per cent. attorney's fees on said principal and interest, and that in all other respects said judgment is affirmed, interveners to pay the costs of this appeal and the costs of the interventions in the trial court.